UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JAMELL MASON,

                              Petitioner,

-against-                                        9:23-CV-193 (LEK)

DAVID ALATARY,

                              Respondent.

_____

**MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION**

        Petitioner Jamell Mason seeks federal habeas corpus relief pursuant to 28 U.S.C. § 2241

following his remand from home confinement to a secure facility. Dkt. No. 1-1 ("Petition").

Respondent David Alatary filed a response in opposition to the Petition with relevant supporting

records. Dkt. No. 17 ("Response"). Petitioner filed a reply. Dkt. No. 20 ("Traverse").

        For the reasons outlined below, the Petition is granted in part and denied in part.

**II.     BACKGROUND**

**A.  Conviction**

        In 2011, the United States District Court for the Northern District of West Virginia

sentenced Petitioner to a 210-month term of imprisonment with six years of supervised release

for violation of various drug laws. See Resp. at 5[1] (citing United States v. Mason, No. 09-CR-87

(N.D.W. Va. May 11, 2013), Dkt. No. 319 at 1–2, 4). Petitioner's projected release date is

September 23, 2024. See id.

_____

[1] Page citations refer to the pagination generated by CM/ECF, the Court's electronic filing
system.

### B.  Home Confinement

On December 15, 2020, the Bureau of Prisons ("BOP") redesignated Petitioner to home confinement pursuant to its authority under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). See id.; Dkt. No. 17-1 ¶ 3 ("Magnusson Declaration"). Upon his redesignation, Petitioner moved home to Brooklyn, New York under the supervision of the Brooklyn House Residential Reentry Center ("RRC"). See Pet. at 3; Resp. at 5. The terms of his home confinement required Petitioner to remain "at [his] place of residence, except for employment, unless . . . given permission to do otherwise." Dkt. No. 17-11 at 2 ("Community Based Program Agreement" or "Agreement").

While home, Petitioner alleges he took OSHA and SST training courses, worked in construction, and cared for his partially paralyzed brother. See Pet. at 2–3. Prior to the incident underlying the Petition, Petitioner twice ran afoul of RRC rules by straying outside of his permitted locations without permission. See Resp. at 6–7; Dkt. No. 17-3 at 2–3; Dkt. No. 17-5 at 2–3. For both offenses, the BOP, acting on the RRC's recommendations, stripped Petitioner of good conduct time ("GCT") but did not remand Petitioner back to secure confinement. See Dkt. No 17-3 at 3; Dkt. No. 17-5 at 3.

### C.  The Underlying Incident

On the night of July 8, 2022, while performing routine monitoring, RRC staff could not reach Petitioner on either his home or cell phone. See Resp. at 7. When Petitioner did not answer his phones, RRC staff performed a "spot check" to verify Petitioner's location. See Magnusson Decl. at ¶ 8. The spot check revealed that Petitioner left his house without permission at 9:03 PM and remained at an unauthorized location in Brooklyn, NY—the Stillwell Avenue Train

Station—at 11:49 PM. See Resp. at 7. RRC staff notified the BOP duty officer, and Petitioner was placed on escape status. See id.

On the morning of July 9, 2022, RRC staff successfully contacted Petitioner and instructed him to report to the RRC facility. See Magnusson Decl. ¶ 8. Petitioner reported to the facility at approximately 10:18 AM and was immediately placed on building restriction. See Dkt. No. 1-2 at 2 ("Initial Incident Report"). RRC staff issued and delivered an incident report to Petitioner that afternoon, charging Petitioner with violating BOP Code 200 (Escape with Subsequent Voluntary Return within 4 Hours) and Code 316 (Being in an Unauthorized Location). See Magnusson Decl. ¶ 8.

On July 11, 2022, RRC staff issued a revised incident report, upgrading Petitioner's Code 200 violation to Code 102 (Escape from Non-Secure Institution Including Community Confinement). See Dkt. No. 17-6 at 2 ("Revised Incident Report"); compare Initial Incident Report with Dkt. No. 1-2 at 4.[2] On the afternoon of July 11, 2022, RRC staff attempted to deliver the Revised Incident Report to Petitioner but, due to a communication break down between RRC staff and Petitioner, it appears Petitioner never received the Revised Incident Report. See Pet. at 9.

Later that day, despite being on building restriction, Petitioner walked out of the RRC facility without permission. See Magnusson Decl. ¶ 10. Petitioner eventually returned voluntarily, but RRC staff issued another incident report charging Petitioner with escape. See id.

On July 12, 2022, RRC staff and the BOP coordinated with the U.S. Marshals to remand Petitioner to a secure facility. See Dkt. No. 17-10 at 2. Petitioner remained in secure confinement

---

[2] As Petitioner notes, the Revised Incident Report also changed a few other details from the Initial Incident Report. See Pet. at 8. However, none of these changes are of consequence here.

until his release back to community confinement at the RRC on March 14, 2024. See Dkt. No. 31 at 1 ("Letter").

On July 27, 2022, RRC staff conducted a Center Discipline Committee ("CDC") hearing to adjudicate the Revised Incident Report ("CDC Hearing"). See Magnusson Decl. ¶ 9; Dkt. No. 17-7 at 2–4 ("CDC Report"). At the CDC Hearing, Petitioner admitted to straying out of bounds on July 8, 2022. See CDC Report at 2–3. As such, RRC staff found Petitioner violated Code 102 and 316 and recommended a loss of thirty-one days of GCT and imprisonment at a secure facility. See id. at 3–4. On August 5, 2022, as required by BOP policy, a BOP disciplinary hearing officer ("DHO") reviewed and adopted the CDC's recommendations in full. See Magnusson Decl. ¶ 9; CDC Report at 4. A copy of the CDC report, certified by the DHO, was given to Petitioner on August 8, 2022. See Pet. at 7–8. Petitioner first learned of the Code 102 violation when reviewing the CDC report. Id.

Petitioner unsuccessfully appealed the CDC's decision via the BOP's administrative remedy program. Magnusson Decl. ¶ 16; Dkt. No. 17-12 at 3–6. Once he exhausted his administrative remedies, Petitioner filed the instant Petition on February 10, 2023. See Pet.

## III.    PETITION

Petitioner seeks federal habeas corpus relief, stating five claims that allege the BOP violated the Fifth Amendment Due Process Clause and other statutory rights. See id. In his first three claims relating to the adjudication of the Revised Incident Report, Petitioner contends that the BOP violated his due process rights when: (1) the DHO review was held in his absence; (2) the CDC Hearing was held eighteen days after the Initial Incident Report was issued; and (3) the BOP did not grant Petitioner the requisite 24-hour notice of the change in charge from Code 200 to Code 102. See id. at 5–10. Petitioner next argues that (4) his procedural due process rights

4

were violated when the BOP remanded him to a secure facility without any process.[3] See id. at 10–11. Lastly, Petitioner contends (5) that the BOP failed to accurately apply Petitioner's First Step Act ("FSA") credits to his sentence. See id. at 11–13. Petitioner also requests the Court to appoint counsel pursuant to 18 U.S.C. § 3006A(a)(2)(B). See id. at 16. Respondent opposes all five counts and seeks to dismiss the Petition. See Resp. at 4–5.

## IV.   DISCUSSION

### A.  Jurisdiction

Habeas corpus relief is available if an individual is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). A petition is properly brought pursuant to 28 U.S.C. § 2241 where a federal prisoner challenges the execution of their sentence, rather than its imposition. See Adams v. United States, 372 F.3d 132, 134–35 (2d Cir. 2004); Jiminian v. Nash, 245 F.3d 144, 146–47 (2d Cir. 2001). Execution of a sentence includes prison disciplinary hearings, so a Section 2241 petition is the proper means to challenge a petitioner's disciplinary hearings. See Adams, 372 F.3d at 135. Petitions filed under Section 2241 must name the petitioner's warden as the respondent and be filed in the district of the petitioner's confinement. 28 U.S.C. § 2241(a); Rumsfeld v. Padilla, 542 U.S. 426, 435, 447 (2004).

Here, Petitioner challenges the impact of an allegedly unlawful disciplinary hearing and was incarcerated at FCI-Ray Brook in the Northern District of New York when he commenced

---

[3] Petitioner also alleges that Respondent violated his substantive due process rights. See Pet. at 1. However, outside of raising the issue in the introductory paragraph of his Petition, Petitioner does not again discuss his substantive due process claim. "The first step in substantive due process analysis is to identify the constitutional right at stake." Kaluczky v. City of White Plains, 57 F.3d 202, 211 (2d Cir. 1995). Without identifying the constitutional right at issue, the Court cannot adjudicate the claim. Therefore, insofar as Petitioner asserts a substantive due process claim, this is dismissed without prejudice.

the instant action. Accordingly, the Section 2241 Petition is the appropriate procedural vehicle to address Petitioner's grievances, see Adams, 372 F.3d at 135, and Petitioner filed suit in the proper court, see Padilla, 542 U.S. at 447.

### B. Petitioner's Claims

#### 1. Claim I: DHO Review

Petitioner argues the BOP violated his due process rights when it did not afford him the opportunity to attend and present documentary evidence and witnesses at the DHO review. See Pet. at 5–6.

In Wolff v. McDonnell, the Supreme Court held that prisoners have the right to attend their disciplinary hearing, including the right to "call witnesses and present documentary evidence in [their] defense." 418 U.S. 539, 566 (1974); see also Superintendent, Mass. Corr. Inst., Walpole v. Hill, 472 U.S. 445, 454 (1985). If the disciplinary hearing takes the form of a CDC hearing, BOP policy requires that a DHO review and certify the CDC's findings. See Mansa v. United States, No. 16-CV-644, 2019 WL 121681, at *13 n.4 (D. Conn. Jan. 7, 2019). In such scenarios, Wolff does not mandate that a prisoner receive two disciplinary hearings, one before the CDC and another before a DHO. See id. ("[Petitioner] received an in-person hearing with the CDC and made a statement. The CDC hearing paperwork was forwarded to the DHO for review and certification pursuant to [BOP] policy. The DHO completed his review and certified the CDC hearing. . . . [Petitioner is] not entitled to an in-person DHO hearing or a separate DHO report."); Colon v. Tellez, No. 20-CV-5252, 2022 WL 521524, at *4 n.8 (E.D.N.Y. Feb. 22, 2022) (finding that the petitioner was not entitled to a DHO hearing after receiving a CDC hearing).

Here, Petitioner received the CDC Hearing. Petitioner attended the CDC Hearing and had an opportunity to call witnesses and present documentary evidence, satisfying Wolff's constitutional requirements. See CDC Report at 2. As such, Petitioner possessed no constitutional right to attend the DHO review or participate in a separate DHO hearing. Since the Court finds that Petitioner's absence at the DHO review did not violate due process, Claim I is denied.

### 2. Claim II: Timing of the CDC Hearing

Petitioner next argues that the timing of the CDC Hearing violates 28 C.F.R. § 541.7(c) and, consequently, violates his due process rights. See Pet. at 6–7. Section 541.7(c) states that a unit disciplinary committee ("UDC") "will ordinarily review [an] incident report within five work days after it is issued." 28 C.F.R. § 541.7(c). Petitioner states that the CDC Hearing, held on July 27, 2022, occurred eighteen days after the publication of the Initial Incident Report, violating Section 541.7(c). See Pet. at 7.

Assuming Section 541.7(c) applies, a plain reading of the regulation belies Petitioner's contention that RRC staff violated Section 541.7(c) by waiting eighteen days to hold the CDC Hearing. District courts both inside and outside the Second Circuit have found the five-day period is not a compulsory rule because of the inclusion of the word "ordinarily." See Epps v. Beard, No. 20-CV-44, 2022 WL 1462762, at *5 (E.D. Ky. May 9, 2022) ("Through its inclusion of the qualifying term 'ordinarily,' the rule intrinsically contemplates the possibility that prison staff might need additional time to provide an inmate a [hearing].") (internal quotation marks omitted); Linares v. Terris, No. 17-CV-11085, 2018 WL 1709027, at *4 (E.D. Mich. Apr. 9, 2018) (finding that the use of "ordinarily" makes clear that the five-day period in Section 541.7(c) is "an aspirational, not a mandatory, requirement"); Berkun v. Terrell, No. 11-CV-3237,

2011 WL 4753459, at *3 (E.D.N.Y. Oct. 7, 2011) ("[T]he inclusion of the word 'ordinarily' in the regulation suggests flexibility; it does not prohibit holding the hearing after [five] days.").[4] With this guidance, the Court rejects Petitioner's contention that the delay in holding the CDC Hearing violated Section 541.7(c). Absent a violation of the regulation, the Court finds Petitioner's due process rights have not been violated. Claim II is denied.

### 3. Claim III: Notice Requirement

Petitioner contends that his due process rights were violated when the CDC failed to provide him with advance written notice of the Code 102 disciplinary charge, and, consequently, prohibited him from mounting an effective defense at his CDC Hearing. See Pet. at 7–10.

Prior to a disciplinary hearing, a prisoner must have 24-hour written notice of the charges brought against him. See Wolff, 418 U.S. at 564; Hill, 472 U.S. at 454. The purpose of the notice requirement is "to inform [the prisoner] of the charges and to enable him to marshal the facts and prepare a defense." Wolff, 418 U.S. at 564. If a charge is amended after notice is already given, the BOP need not give new notice if the discrepancy does not impair the petitioner's ability to prepare a defense. See Northern v. Hanks, 326 F.3d 909, 911 (7th Cir. 2003) ("Because the factual basis of the investigation report gave [petitioner] all the information he needed to defend against the trafficking charge, the reviewing authority's modification [of the charges] did not deprive [petitioner] of his due process rights."); Holt v. Caspari, 961 F.2d 1370, 1373 (8th Cir. 1992) (finding no due process violation when a charge was upgraded without new notice because the incident report "gave [the prisoner] all of the information he needed to make his defense"); Rogers v. Buss, No. 07-CV-569, 2008 WL 2151431, at *2 (N.D. Ind. May 21, 2008) ("Changing

---

[4] Berkun reviewed the regulation when the allotted review time was three days. Compare 28 C.F.R. § 541.15(b) (2010), with 28 C.F.R. § 541.7(c) (2024).

the rule with which [petitioner] was accused of violating did not deny him due process because the conduct report stated facts that supported the corrected charge and provided the facts he needed to prepare his defense against that charge.").

Respondent argues Petitioner received the Revised Incident Report and, consequently, had adequate notice of the Code 102 charge. See Resp. at 7. Petitioner contests this assertion, see Pet. at 9, but both parties agree that on July 11, 2022, RRC staff at least attempted to give Petitioner the Revised Incident Report with the Code 102 charge. See Resp. at 7; Pet. at 9. Petitioner states that RRC staff never explained to him that the Initial Incident Report had been updated, and, therefore, he refused RRC staff's attempt to give him the Revised Incident Report on July 11, 2022, as he believed he already possessed the correct incident report. See Pet. at 9. Respondent does not directly dispute Petitioner's version of the events, but simply states Petitioner refused the Revised Incident Report. See Resp. at 7. Given these allegations, the Court finds that Petitioner was not aware he was charged with Code 102 before the CDC Hearing.

Respondent also argues that Petitioner received the Initial Incident Report, and, therefore, notice of the Code 102 charge. See Resp. at 24. Specifically, Respondent argues Petitioner "failed to submit the version of the [Initial] Incident Report he allegedly received, and instead has submitted the very same incident report as Respondent [which showed the Code 102 charge]." Resp. at 24. Respondent concludes that this proves Petitioner received notice of the Code 102 charge. See id. Respondent is factually incorrect. Petitioner submitted two incident reports. The first submission shows an incident report delivered on July 9, 2022, with a Code 200 violation. See Initial Incident Report. The second shows the Incident Report with a Code 102 violation, delivered on July 11, 2022, which Petitioner states he did not receive until August 8,

2022—well after the CDC Hearing. See Dkt. No. 1-2 at 4; Pet. at 9. As such, the Court rejects this argument.

Respondent next argues that, even if Petitioner was not aware of the Code 102 charge, the differences between a Code 200 Escape and a Code 102 Escape did not impair Petitioner's ability to prepare an adequate defense. See Resp. at 24–25. Therefore, Respondent concludes, the lack of awareness did not violate Petitioner's due process. See id.

As support, Respondent cites to a district court ruling from the Eastern District of California. See Reed v. Babcock, No. 13-CV-2450, 2015 WL 1932526, at *2 (E.D. Cal. Apr. 15, 2015). In Reed, a petitioner who was initially charged with a Code 102 violation was instead found guilty of a downgraded Code 200 violation; the petitioner argued that, since he had not received notice of the Code 200 violation until after the disciplinary hearing, the guilty finding violated his due process rights. See id. at *2. The court in Reed found that the revision to the charges without new notice did not violate the petitioner's due process rights as the petitioner's defense did not "implicate the distinction between [C]ode 200 escape and [C]ode 102 escape[,]" and that the petitioner had all the information he needed to defend against the Code 200 charge from the initial notice. Id. at 3.

Unlike in Reed, Petitioner did not receive notice of the different charge that was more severe than the one initially charged. See id. (finding "notice of the *most severe* such charge that might be supported by those facts[] provided [the] petitioner with exactly what Wolff requires.") (emphasis added). Moreover, Petitioner argues he would have presented evidence, including witness testimony, that he returned to confinement within four hours of his initial escape in an effort to have the Code 102 charge downgraded to a Code 200 charge. See Trav. at 12–13; cf. Reed, 2015 WL 1932526, at *3 ("Nothing in the record suggests that petitioner's defense at the

hearing would have differed" depending on how the escape was charged). Therefore, the Court concludes that, as Petitioner's ability to present a mitigation defense was impaired by the lack of notice, the lack of notice violated his due process rights.

However, even if a due process violation occurs, "it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal [] assessment as to whether the error was harmless or prejudicial." Powell v. Coughlin, 953 F.2d 744, 750 (2d Cir. 1991); see also Green v. Christensen, No. 23-CV-127, 2024 WL 1619392, at *3 (N.D.N.Y. Apr. 15, 2024) ("[P]rior to receiving judicial relief for a due process violation in a disciplinary hearing, a prisoner must demonstrate that the violation harmed them in some way."); Mendez v. Bell, No. 16-CV-2123, 2018 WL 4039321, at *5 (D. Conn. Aug. 23, 2018) (finding an absence of prejudice "cannot make out a due process violation"). "[T]he proof of prejudice must be definite and not speculative." United States v. Birney, 686 F.2d 102, 105–06 (2d Cir. 1982); see also Green, 2024 WL 1619392, at *3 (same). The burden of proving prejudice rests with the petitioner. See Green, 2024 WL 1619392, at *3.

While Petitioner has established a violation of due process, Petitioner does not demonstrate prejudice. For example, Petitioner does not argue that he would not have been remanded from home confinement to secure confinement with the Code 200 violation. As such, Petitioner's argument that he suffered harm is at most speculative, and speculative prejudice is not enough to "make out a due process violation." Mendez, 2018 WL 4039321, at *5; see also Powell, 953 F.2d at 750 (finding that when prejudice is only speculative, a technical violation of due process does not require judicial intervention). The Court concludes that, as Petitioner failed to make the requisite showing of prejudice, judicial relief is not warranted. Claim III is denied.

### 4. *Claim IV: Revocation of Home Confinement*

Petitioner argues the BOP violated his constitutional rights when it revoked his home confinement without the requisite due process. See Pet. at 10–11. Respondent contends that Petitioner lacks a liberty interest in home confinement and, therefore, was not entitled to process prior to its revocation. See Resp. at 14.

#### a.   Liberty Interest Jurisprudence

To state a procedural due process claim, a prisoner must show that they have a protected liberty interest. See Kerry v. Din, 576 U.S. 86, 90 (2015) (noting that no process is due when no liberty interest is at stake). A prisoner has no liberty interest in being placed outside of a traditional prison setting or being "conditionally released before the expiration of a valid sentence." Greenholtz v. Inmates of Neb. Penal Corr. Complex, 442 U.S. 1, 7 (1979). However, government action in the carceral environment can create a liberty interest. See Wolff, 418 U.S. at 557–58 (holding that a state statute granting GCT created a liberty interest in a "shortened prison sentence").

District courts are far from uniform on what, if any, liberty interest is provided to an individual placed on continued home confinement pursuant to the CARES Act. Compare Aurecchione v. Falco, No. 22-CV-4538, 2023 WL 6255529, at *12 (S.D.N.Y. Sep. 25, 2023) (explaining that "[e]volving caselaw in the Second Circuit reinforces the existence of [a] right to process" in home confinement cases and recognizing a liberty interest in maintaining continued home confinement); Freeman v. Pullen, 658 F. Supp. 3d 53, 66–67 (D. Conn. 2023) (concluding that a habeas petitioner had a liberty interest in continued home confinement) with Triplett v. FCI Herlong Warden, No. 22-CV-83, 2023 WL 2760829, at *3 (E.D. Cal. Apr. 3, 2023) (finding the petitioner had no liberty interest in remaining on home confinement); Touizer v. Attorney

General of the United States, No. 20-CV-5169, 2021 WL 371593, at *4 (S.D. Fla. Feb. 3, 2021) (same). Although the Court finds the precedent within the Second Circuit persuasive, the Court will engage in its own independent analysis to determine whether Respondent created a liberty interest in the CARES Act home confinement program. The Court first turns to the liberty interest jurisprudence involving other community confinement programs.

District courts assess potential liberty interests using the guidance established by Morrissey v. Brewer, 408 U.S. 471 (1972). In Morrissey, two prisoners filed habeas petitions after their parole was revoked without a hearing. See 408 U.S. at 472–74. Each petitioner claimed that they retained a liberty interest in remaining on parole and that the arbitrary revocation violated their due process rights. See id. at 474. To determine if a liberty interest existed in remaining on parole, the Supreme Court examined the nature and conditions of parole. See id. at 477–82. The Supreme Court explained that the nature of parole "is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." Id. at 477. Since parolees, while subject to certain limitations, could still "be gainfully employed and [are] free to be with family and friends and to form the other enduring attachments of normal life," the Supreme Court concluded that the parolees' "condition is very different from that of confinement in a prison." Id. at 482.

The Morrisey Court also noted that the nature of the parole program included "an implicit promise that parole will be revoked only if [parolees] fail[] to live up to the parole conditions." Morrisey, 408 U.S. at 482.; see also id. at 479 ("Implicit in the system's concern with parole violations is the notion that the parolee is entitled to retain his liberty as long as he substantially abides by the conditions of his parole.").

Applying the then-governing "grievous loss" standard, the Supreme Court concluded that the parole program created a liberty interest as it possessed "many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee." Id. at 482. Thus, termination of parole required "some orderly process, however informal." Id.

The Supreme Court applied the reasoning in Morrissey when it reviewed a preparole program in Oklahoma's state prisons. See Young v. Harper, 520 U.S. 143 (1997). In Young, a prisoner spent five "uneventful" months in community confinement pursuant to the preparole program after which State authorities denied him parole and returned him to state prison without process. See id. at 145–46. The prisoner filed a habeas petition, claiming the revocation of his preparole deprived him of liberty without due process. See id. at 146. The Supreme Court agreed, extending Morrissey to the preparole program. See id. at 147. In coming to its decision, the Supreme Court compared the preparole program to the parole program in Morrissey with respect to the conditions of liberty conferred. See id. at 148–152. The Supreme Court noted that, though the preparole program restricted the prisoner from certain activities, a participant could still live at home, work, and "live[] a life generally free of the incidents of imprisonment," just as the parolees in Morrissey could. Id. at 148. Additionally, as in Morrissey, the preparole program included an implicit promise that a preparolee would remain free absent a violation of the program. See id. at 150–51. The Supreme Court concluded that, as the preparolee program was "equivalent to parole," the preparolee held a liberty interest in his freedom entitling him to the procedural protections of Morrissey. Id. at 147.

Following Morrissey and Young, the Second Circuit has applied Morrissey to analyze whether the Due Process Clause creates a liberty interest in various community confinement programs by comparing the community confinement program to the liberty interest found in

parole and preparole programs. See Holcomb v. Lykens, 337 F.3d 217, 222–25 (2d Cir. 2003)

(applying Morrissey to Vermont's temporary furlough program and finding petitioner received

the procedural protections outlined in Morrissey); Anderson v. Recore, 317 F.3d 194, 200 (2d

Cir. 2003) (finding Morrissey held that once community confinement similar to parole is

granted, "it cannot [be] take[n] . . . away without according the inmate procedural due process");

Kim v. Hurston, 182 F.3d 113, 118–119 (2d Cir. 1999) (applying Morrissey to a New York work

release program and holding the prisoner had a liberty interest in remaining in the program).

Against this backdrop, the Court turns to its examination of the present facts.

b.  Respondent's Preliminary Arguments

As a preliminary matter, Respondent argues that the Court should dismiss Claim IV as

the Court "has no authority to grant Petitioner's request for immediate . . . placement in home

confinement because those decisions are within the BOP's sole discretion." Resp. at 10. The

Court recognizes that the BOP generally has sole discretion in the placement and transfer of

prisoners. See 18 U.S.C. § 3621(b) (establishing that the "[BOP] shall designate the place of the

prisoner's imprisonment" and "may at any time[] . . . direct the transfer of a prisoner from one

penal or correctional facility to another," and that "a designation of a place of imprisonment . . .

is not reviewable by any court"); see also Touizer, 2021 WL 371593, at *3 (finding that the BOP

has "exclusive authority . . . to designate the place of an inmate's confinement").

However, the Court finds the comparison to Touizer unpersuasive. Despite the BOP's

broad authority under Section 3621(b), judicial review is appropriate where the BOP's actions

allegedly violate the Constitution. See Freeman, 658 F. Supp. 3d at 63 (citing cases). As Claim

IV turns on constitutional questions, the Court rejects Respondent's argument that the BOP's

authority prevents judicial review.

Respondent next argues that the Morrissey and Young line of cases do not apply. See Resp. at 15–17. Instead, Respondent asserts that Meachum v. Fano, 427 U.S. 215 (1976) controls. See id. In Meachum, the Supreme Court ruled that a prisoner had no liberty interest in his prison setting and that a prison administration could transfer a prisoner to another prison with no process without running afoul of the Due Process Clause. Meachum, 427 U.S. at 228–29. Respondent argues that Meachum applies because, despite being on home confinement, Petitioner remains in BOP custody as "a federal inmate, serving an ongoing federal sentence," and, thus "[is] less like the parolees and preparolees . . . in Morrissey and Young, and more like the inmate[] in Meachum." Resp. at 17.

The Court finds Respondent's argument unpersuasive. In Young, Oklahoma made a similar argument, claiming that because the preparolee remained in custody like the petitioner in Meachum, Meachum should control. See Young, 520 U.S. at 148. The Supreme Court rejected the argument, noting the preparolees' actual conditions more closely resembled Morrissey despite Oklahoma's technical characterization of the preparolees' custody. See id. at 148–49; see also Recore, 317 F.3d at 200 ("Because [the petitioner], like the petitioner[] in Morrissey . . . lived outside the prison, a comparison to the ordinary conditions of prison life is inappropriate.").

Here, as in Young and Morrissey, Petitioner's home confinement allowed Petitioner to live at home "free of the incidents of imprisonment." Young, 520 U.S. at 148. Given the conditions of Petitioner's home confinement, the Court will apply Morrissey to decide Claim IV.

c.   Morrissey Test

No controlling authority has yet answered whether revocation of home confinement granted pursuant to the CARES Act requires the procedural protections granted to parolees by

Morrissey.[5] The Court is also unaware of any binding precedent that addresses the constitutional rights of prisoners on home confinement pursuant solely to 18 U.S.C. § 3624(c)(2). Accordingly, the Court will use Morrissey to undertake an independent examination of Petitioner's constitutional rights on home confinement.

To successfully prove the existence of a liberty interest in home confinement, Petitioner must plausibly allege (1): that the conditions of the home confinement program are sufficiently similar to the conditions of the parole program in Morrissey with respect to the extent and conditions of liberty conferred; and (2) that the home confinement program implicitly promised that Petitioner's home confinement status would continue absent misconduct. Morrissey, 408 U.S. at 481–82; Young, 520 U.S. at 147–48; see also Holcomb, 337 F.3d at 222–23; Cardoza, 2022 WL 3212408, at *8.

### i.  Liberty Conferred

Petitioner contends that the first prong is met because the liberty conferred by his home confinement "bears such [a] strong resemblance to the [p]arole [p]rogram in Morrissey." Pet. at 10. Petitioner explains that his home confinement allowed him to live at home, take care of his

---

[5] Although the Second Circuit has not yet addressed the issue of whether procedural protections are required when CARES Act home confinement is revoked, district courts in the Second Circuit have examined the issue. See Freeman, 658 F. Supp. 3d at 60–68 (applying Morrissey and finding the petitioner was entitled to due process protections prior to revocation of home confinement granted by the CARES Act); Cardoza v. Pullen, No. 22-CV-591, 2022 WL 3212408, at *6–14 (D. Conn. Aug. 9, 2022) (applying Morrissey but rejecting the petitioner's due process claim as no implicit promise was made to the prisoner); Tompkins v. Pullen, No. 22-CV-339, 2022 WL 3212368, at *4–15 (D. Conn. Aug. 9, 2022) (applying Morrissey and finding the petitioner was entitled to due process protections prior to revocation of home confinement granted by the CARES Act). Respondent agrees that no controlling authority exists but points the Court to several circuit and district court cases outside of the Second Circuit that have touched on the issue. See Resp. at 19–20. However, none of the cases cited by Respondent deal with the issue directly; therefore, the Court does not discuss them here.

brother, work, and "form certain attachments common to normal life," and concludes that, as in Morrissey, his living conditions are distinct from normal "confinement in a prison." Id. at 10–11.

With respect to the extent of the liberty conferred, some factual differences do exist between the home confinement program and the parole program in Morrissey. For example, the parolee in Morrissey was free to travel within his "community," Morrissey 408 U.S. at 478, while Petitioner required permission to travel anywhere but home and work. See Agreement at 2. Despite these stricter rules, "the privileges available in [home confinement] are worlds apart [] from eating prisoner food in a cell." See Ortega v. U.S. Immigration and Customs Enforcement, 737 F.3d 435, 439 (6th Cir. 2013). Thus, the Court is unconvinced that the differences are so stark as to prevent a finding that home confinement "include[s] many of the core values of unqualified liberty" found in Morrissey. 408 U.S. at 482. As such, the Court holds that Petitioner satisfies the first step of the Morrissey analysis.

### ii.   Implicit Promise

Turning to the implicit promise analysis, Respondent argues no implicit promise arises from "any statutory, regulatory, or other governing authority," and, as such, no "reasonable inmate [could] conclude that he is entitled to remain in home confinement" absent misconduct. Resp. at 19.

"The Morrissey line of cases does not specify where such an implicit promise must originate." Cardoza, 2022 WL 3212408, at *12. An implicit promise of continuing liberty need not be communicated via a statutory or regulatory authority. See Morrissey, 408 U.S. at 492–93 (Douglas, J., dissenting) (stating that the majority found an indication of an implicit promise despite the statute governing the parole program providing the warden complete discretion to

revoke parole at any time). "Imposing such a requirement would be more akin to requiring an explicit promise, as opposed to an implicit one." Cardoza, 2022 WL 3212408, at *12.

Historically, courts have found an implicit promise in various sources. See Morrissey, 408 U.S. at 479, 482 (finding an implicit promise in the nature of parole and the "system's concern with parole violations"); Holcomb, 337 F.3d at 223 (examining the community confinement statute to determine if an implicit promise exists); Pugliese v. Nelson, 617 F.2d 916, 922 (2d Cir. 1980) ("To qualify as constitutionally protectible 'liberty,' the prisoner's interest must be . . . one that he would normally expect to have as a matter of custom and practice or of fundamental decency and fairness."); Ortega, 737 F.3d at 439 ("What process is due . . . may well turn on the notice given to the individual before he was allowed to serve a prison sentence at home."). Thus, the Court rejects Respondent's contention.

Petitioner argues that the Community Based Program Agreement governing Petitioner's home confinement implicitly promises that his home confinement would not be revoked without misconduct. See Trav. at 9. Specifically, the Agreement states that "failure to remain at the required locations [or heed other rules in the Agreement] may result in disciplinary action and/or prosecution for escape." Agreement at 2. The Agreement also explains that if Petitioner "decline[s] to participate in the recommended Home Detention program [he] may face administrative reassignment out of the residential reentry program." Id. Petitioner argues that one could reasonably infer based on such language that reincarceration could only stem from misconduct. See Trav. at 9. Further, the Agreement does not state that home confinement could be arbitrarily terminated. Petitioner contends that the lack of such language, coupled with the disciplinary warnings described above, give "no hint" that he may be removed from home

confinement without cause, thus creating a reasonable expectation that he would remain on home confinement "except by committing [a] major infraction." Trav. at 10.

Petitioner also notes that the then-Director of the BOP, Michael Carvajal "indicated in a 2020 address to the Senate Committee on the Judiciary that he expected those removed to home confinement pursuant to the CARES Act would remain on home confinement" barring misconduct. Id. Furthermore, BOP General Counsel Ken Hyle wrote in a report that those on home confinement pursuant to the CARES Act would only be "transferred back to secure correctional facilities if there are any significant disciplinary infractions or violations of the home confinement agreement." Id. Petitioner argues that the statements from BOP leadership make clear that the BOP "does not employ a widespread practice of reincarcerating individuals" released on home confinement. Id. This, Petitioner argues, could "reasonably [] instill an expectation that one would be permitted to continue on home confinement absent good cause for revocation." Id. The Court agrees with Petitioner, finding an implicit promise that Petitioner would remain on home confinement absent misconduct.

Accordingly, the Court concludes that Petitioner possesses a liberty interest in home confinement that required some process prior to its permanent revocation.

### d.  Procedure Due

The Court must next examine the process due. No controlling authority dictates what process a prisoner on home confinement should receive prior to its revocation; nor does either party brief the issue. Considering the similarities between home confinement and the parole program in Morrissey, the Court concludes that Morrissey protections apply here. See Young, 520 U.S. at 152–53 (establishing that, since preparole was sufficiently like parole, a preparolee was entitled to the procedural protections set forth in Morrissey); Tompkins, 2022 WL 3212368,

at *11–12 (holding that <u>Morrissey</u> protections applied to a prisoner whose home confinement was revoked without due process). As such, prior to permanently revoking home confinement, the BOP must provide the <u>Morrissey</u> procedural protections described below.

In <u>Morrissey</u>, the Supreme Court laid out a two-hearing process to satisfy a parolee's due process. <u>Morrissey</u>, 408 U.S. at 485–90. Following the detention of a parolee for an alleged violation of parole conditions, "some minimal inquiry [must] be conducted . . . near the place of the alleged parole violation or arrest and as promptly as convenient after arrest while information is fresh and sources are available." <u>Id.</u> at 485. This preliminary hearing requires only a showing of "probable cause" to justify the parolee's continued detention. <u>Id.</u> The adjudicator of the preliminary hearing must "not [be] directly involved in the case" but "need not be a judicial officer." <u>Id.</u> at 485–86. The parolee must also receive notice of the hearing which "should state what . . . violations have been alleged." <u>Id.</u> at 487; <u>see</u> <u>Tompkins</u>, 2022 WL 3212368, at *12. At the hearing, the parolee may testify on his own behalf, present documentary evidence, call witnesses, and cross examine adverse witnesses. <u>See</u> <u>Morrissey</u>, 408 U.S. at 487. Upon returning a decision, the adjudicator must provide some type of summary of the evidence presented and their conclusions. <u>See</u> <u>id.</u> If a determination of probable cause is made in the preliminary hearing, a parolee may be constitutionally detained pending the second <u>Morrissey</u> hearing. <u>See</u> <u>id.</u>

Following a probable cause finding in the preliminary hearing, a revocation hearing is still required to permanently revoke parole. <u>See</u> <u>Morrissey</u>, 408 U.S. at 487–88; <u>Williams v. Ward</u>, 556 F.2d 1143, 1156 (2d Cir. 1977) ("A later revocation hearing was required, prior to the final decision on revocation."). The revocation hearing must "be tendered within a reasonable time after the parolee is taken into custody." <u>Morrissey</u>, 408 U.S. at 488; <u>see also</u> <u>id.</u> (finding a

delay of two months to be reasonable). To satisfy the "minimum requirements of due process," the parolee must receive:

> (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.

Id. at 489.

In detailing the requirements of the revocation hearing, the Supreme Court did not specify the burden of proof required to permanently remand a parolee to secure custody. However, the Supreme Court stressed that the revocation hearing does not "equate . . . to a criminal prosecution in any sense." Id. at 489. Thus, the Court concludes that the high standard of a criminal prosecution is inappropriate. Yet, the Supreme Court also noted that the revocation hearing "must be the basis for more than determining probable cause." Id. at 488. Therefore, an evidentiary standard between "beyond a reasonable doubt" and "probable cause" is appropriate. Since the preponderance standard is used in revocation hearings for similar programs like probation and supervised release, see 18 U.S.C. § 3583(e)(3); United States v. Bujak, 347 F.3d 607, 609 (6th Cir. 2003); United States v. Teran, 98 F.3d 831, 836 (5th Cir. 1996), the Court concludes that a "preponderance of the evidence" is the appropriate evidentiary burden.

### e.   Process Received

The Court next examines whether the process Petitioner received met these requirements. Following numerous alleged violations of the home confinement program, RRC staff, BOP staff, and the United States Marshals coordinated to remand Petitioner to secure confinement on July

22

12, 2022. <u>See</u> Magnusson Decl. ¶ 12. On July 27, 2022, Petitioner faced a neutral CDC board that afforded Petitioner all the procedural protections required by a <u>Morrissey</u> preliminary hearing. Petitioner (1) had the opportunity to testify, call and confront witnesses, and present evidence, <u>see</u> CDC Report at 2; (2) received a brief written summary of the evidence and the CDC board's conclusions, including a recommendation to keep Petitioner in secure custody, <u>see</u> <u>id.</u> at 3; and (3) faced no significant delay between his remand to secure custody on July 12, 2022, and the CDC Hearing on July 27, 2022. Considering the process Petitioner received, the Court concludes Petitioner's secure confinement immediately following his CDC Hearing did not violate Petitioner's due process rights.

However, Petitioner never received a revocation hearing as required by step two of <u>Morrissey</u>.  Petitioner received a DHO review after his CDC Hearing, <u>see</u> Magnusson Decl. ¶ 9; CDC Report at 4, but Petitioner was not notified of, present for, or given the opportunity "to present witnesses and documentary evidence" at a DHO review or any associated hearing. <u>Morrissey</u>, 408 U.S. at 489. Therefore, any DHO review or hearing did not satisfy the "minimum requirements of due process" guaranteed to Petitioner by <u>Morrissey</u>. <u>Id.</u> Accordingly, the Court finds that Respondent violated Petitioner's due process rights in revoking his home confinement without a proper revocation hearing as required by <u>Morrissey</u>. With respect to Claim IV, the Petition is granted.

### f.   <u>Remedy</u>

In relation to the unconstitutional revocation of his home confinement, Petitioner seeks "immediate release (while awaiting [a] revocation hearing that complies with [d]ue [p]rocess), [a] declaration that Respondents have insufficient basis under the Due Process [C]lause to detain

him . . ., [and] an injunction against Petitioner's continued imprisonment until his due process rights have been restored." Dkt. No. 1 at 7 ("Petition Application").[6]

"[The proper remedy for a due process violation is the process itself." Tompkins, 2022 WL 3212368, at *14; see United States ex rel Bey v. Conn. State Bd. of Parole, 443 F.2d 1079, 1089–90 (2d Cir. 1971) (concluding that the proper remedy for an improper parole revocation hearing was a new revocation hearing), vacated on other grounds sub nom. Conn. State Bd. of Pardons v. Bey, 404 U.S. 879 (1971). Thus, the Court holds that the proper remedy for Petitioner is not immediate release to home confinement but a Morrissey revocation hearing. To the extent Petitioner argues that his continued detention while awaiting the revocation hearing is unconstitutional, the Court disagrees. Petitioner received a preliminary hearing in accordance with Morrissey, making his detention lawful for a "reasonable" period of time while awaiting the revocation hearing. Petitioner was also transferred back to community confinement at the RRC on March 14, 2024. See Letter at 1. Now that Respondent is on notice that a revocation hearing is required, the Court finds that Petitioner's continued detention remains lawful for a "reasonable" period. If needed, Petitioner's continued detention can be revisited if the Respondent fails to provide a timely revocation hearing following the publication of this order. See Billiteri v. United States Bd. of Parole, 541 F.2d 938, 946 (2d Cir. 1976) ("If the case was before the court on a petition for habeas corpus, it may order compliance within a reasonable

---

[6] The Court notes that Petitioner was released from secure custody to a halfway house in Brooklyn, New York on March 14, 2024. Dkt. No. 31 at 1. If a federal court can no longer grant the relief sought to resolve a controversy, subject matter jurisdiction is lost, and the matter becomes moot. See Martin-Trigona v. Shiff, 702 F.2d 380, 386 (2d. Cir. 1983) ("The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed."). As Petitioner specifically requested release to home confinement, see Pet. at 1, the Court finds the issue is not moot.

period, failing which it may order the petitioner discharged from custody."). Accordingly, Petitioner's request for immediate release is denied without prejudice, subject to renewal should the BOP neglect to provide a <u>Morrisey</u> revocation hearing within a reasonable time frame.

Petitioner also seeks declaratory relief. <u>See</u> Pet. at 1. The Declaratory Judgment Act ("DJA") permits a federal court to declare the rights of a party "whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The DJA "confers a discretion on the courts rather than an absolute right upon the litigant." <u>Public Service Comm'n of Utah v. Wycoff Co.</u>, 344 U.S. 237, 241 (1952). Here, the Court has found a constitutional violation in relation to the revocation of home confinement and declaratory relief would prove duplicative. Accordingly, the Court declines to exercise its discretion under the DJA.

As for Petitioner's request for an injunction against continued imprisonment, <u>see</u> Pet. Application at 7, the Court dismisses the request as moot as Petitioner is no longer in secure confinement.

### 5. *Count V: First Step Act*

Petitioner's last claim accuses the BOP of failing to accurately apply Petitioner's First Step Act ("FSA") credits to his sentence. <u>See</u> Pet. at 11–13.

A petitioner seeking relief pursuant to Section 2241 must exhaust their administrative remedies. <u>See</u> <u>Carmona v. United States Bureau of Prisons</u>, 243 F.3d 629, 634 (2d Cir. 2001). "This requires compliance with the BOP's four-step Administrative Remedy Program." <u>Lallave v. Martinez</u>, 609 F. Supp. 3d 164, 179 (E.D.N.Y. 2022) (citing 28 C.F.R. § 542.10(a)).

To exhaust the BOP's four-step Administrative Remedy Program a prisoner must complete the following steps:

> The first step of the prescribed process entails making an effort to obtain an early resolution of the matter by raising the issue

> informally to staff. In the event this avenue does not lead to a
> successful resolution, the inmate next may submit a formal written
> [Administrative Remedy ("AR")] to the warden of the particular
> facility involved, utilizing a designated BP–9 form, within twenty
> days of the relevant event. If the AR is denied, an appeal may be
> taken to the appropriate BOP Regional Director within twenty
> calendar days of the date of denial. As a fourth and final step, an
> unfavorable decision from the Regional Director may be appealed
> to the General Counsel's office (also referred to as the "Central
> Office" [or "CORC"]) within thirty days of the date on which the
> Regional Director rejects the inmate's appeal.

Barber v. Perdue, No. 11-CV-127, 2012 WL 5996342, at *4 (N.D.N.Y. Nov. 9, 2012) (internal

citations omitted).[7] In sum, "[n]o administrative appeal is fully exhausted until the BOP's

Central Office reviews it." Reynolds v. Warden of FCI Ray Brook, No. 16-CV-1264, 2019 WL

8064012, at *3 (N.D.N.Y. Aug. 5, 2019). The burden of demonstrating exhaustion rests with the

petitioner. See Spring v. Schult, No. 08-CV-531, 2009 WL 3232183, at *1 (N.D.N.Y. Oct. 1,

2009) (Kahn, J.).

      A federal inmate's failure to exhaust the administrative remedies available to him prior to

commencing a Section 2241 action may "only be excused upon a showing of cause and

prejudice." Carmona, 243 F.3d at 634. To demonstrate legal "cause," a petitioner must establish

that "something external to the petitioner, something that cannot be fairly attributed to him,"

prevented the petitioner from fully exhausting his administrative remedies. Tineo v. United

States, 977 F. Supp. 245, 253 (S.D.N.Y. 1996) (quoting Coleman v. Thompson, 501 U.S. 722,

753 (1991)). Factors that constitute "cause" include "interference by officials that makes

compliance with procedural rules impractical." Hinebaugh v. Wiley, 137 F. Supp. 2d 69, 75

---

[7] The exhaustion provisions imposed by the Prisoner Litigation Reform Act ("PLRA") do not
apply to habeas corpus Petitions. See Carmona, 243 F.3d at 634 ("[W]e note that although . . .
the P[LRA] . . . contains a statutory administrative exhaustion requirement, . . . the requirements
of the [PLRA] do not apply to habeas proceedings.").

(N.D.N.Y. 2001) (cleaned up) (quoting <u>Tineo</u>, 977 F. Supp. at 253.) General and conclusory allegations will not be enough to establish cause; rather, a petitioner must plead specific facts. See <u>Rosario v. Quay</u>, No. 15-CV-523, 2017 WL 337977, at *3 (D. Conn. Jan. 23, 2017). To establish prejudice, a petitioner must show "actual harm resulting from the alleged [interference]." <u>Hinebaugh</u>, 137 F. Supp. 2d at 75.

Petitioner and Respondent both agree that Petitioner failed to fully exhaust his administrative remedies concerning his FSA credits. <u>See</u> Pet. Application at 8; Resp. at 27. Therefore, Count V will be procedurally barred unless the Court excuses Petitioner's failure to exhaust under the "cause and prejudice" test.

The Court first considers whether the BOP's failure to respond to his BP-9 appeal establishes "cause." <u>See</u> Trav. at 13–14. The exhaustion rules instruct inmates to treat non-responses to an administrative appeal as a denial. <u>See</u> 28 C.F.R. § 542.18; <u>Zenquis v. Pullen</u>, No. 22-CV-1151, 2023 WL 2931585, at *2 (D. Conn. Apr. 13, 2023). Thus, the lack of response to the BP-9 cannot constitute "cause" as the non-response did not prevent him from pursuing the remaining administrative remedies. <u>See</u> <u>Tineo</u>, 977 F. Supp. at 253.

The Court next considers whether Petitioner's transfer from FCI Ray Brook, where he filed the BP-9, constitutes "cause" that should excuse his failure to exhaust. <u>See</u> Trav. at 13–14. However, Petitioner provides no details as to how his transfer from FCI Ray Brook made "compliance with procedural rules impractical." <u>Hinebaugh</u>, 137 F. Supp. 2d at 75 (cleaned up). Without such detail, Petitioner's allegations are too general and conclusory to adequately show that "he was prevented from fully pursuing his administrative remedies due to circumstances beyond his control." <u>Rosario</u>, 2017 WL 337977, at *3. Conclusory allegations are not enough to

establish "cause." See id. Without the requisite demonstration of "cause," the Court cannot

excuse Petitioner's failure to exhaust. Therefore, the Court dismisses Count V without prejudice.

### 6. Right to Counsel

Petitioner also requests the Court to appoint counsel pursuant to 18 U.S.C. §

3006A(a)(2)(B) "to supplement and/or perfect his filing." Pet. at 16.

"Where, as here, an evidentiary hearing is unnecessary, the appointment of counsel to

represent a pro se habeas Petitioner rests in the court's discretion." United States ex rel. Cadogan

v. LaVallee, 502 F.2d 824, 826 (2d Cir. 1974). A district court "should not [exercise its

discretion to appoint counsel] where the petitioner has raised the relevant issues with sufficient

detail that the district court can thoroughly consider them." Florez v. Walker, No. 00-CV-1576,

2005 WL 1669826, at *1 (N.D.N.Y. July 16, 2005).

Here, Petitioner has raised his claims with clarity and, as no evidentiary hearing is

required, the Court finds no reason to appoint counsel. Accordingly, Petitioner's request for

counsel is denied.

Lastly, the Court notes that a certificate of appealability is not required for Petitioner to

appeal the denial of his Petition because the Petition was brought under 28 U.S.C. § 2241. See

Murphy v. United States, 199 F.3d 599, 601 n.2 (2d Cir. 1999) (holding that the Antiterrorism

and Effective Death Penalty Act's certificate of appealability requirement does not apply to

Section 2241 petitions).

## V.   CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that that the Petition, Dkt. No. 1-1, is **DENIED AND DISMISSED** with respect to Counts I, II, III, and V; and the Petition, Dkt. No. 1-1, is **GRANTED** with respect to Count IV; and it is further

**ORDERED**, that the BOP conduct a Morrissey revocation hearing, within a reasonable amount of time, in accordance with the requirements discussed in Section IV.B.4.d.; and it is further

**ORDERED**, that the Clerk enter judgment and close this case; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:        August 27, 2024
                    Albany, New York

LAWRENCE E. KAHN
United States District Judge